UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-cv-607

| | | |
|---|---|---|
| RICKY GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | **(Jury Trial Demanded)** |
| CUMMINS INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

NOW COMES the Plaintiff, by and through undersigned counsel, and amends his Complaint pursuant to Rule 15(a) and alleges as follows:

## NATURE OF THE CASE

This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as well as the common law of the State of North Carolina. Plaintiff seeks redress for the unlawful discriminatory conduct of Defendant, who subjected Plaintiff to gender-based discrimination, including a hostile work environment and disparate treatment, in violation of federal law. Plaintiff also asserts claims under North Carolina common law for negligent supervision and retention and for intentional infliction of emotion distress. This Court's jurisdiction is invoked to redress the deprivation of rights guaranteed under Federal and State law. Plaintiff seeks damages for the harm suffered, including but not limited to, emotional distress, mental anguish, reputational damage, compensatory and punitive damages, and economic loss, as a direct result of Defendant's intentional and wrongful acts as more fully set forth below.

## PARTIES AND JURISDICTION

1. Plaintiff Ricky Green ("Plaintiff" or "Ricky") is, and at all time relevant to this Complaint, a citizen and resident of Rocky Mount, Nash County, North Carolina.

2. Defendant Cummins, Inc. ("Defendant" or "Cummins") is, and at all times relevant to this Complaint, a corporation incorporated under the laws of the State of Indiana, with a principal place of business in Indiana and operating a facility and/or conducting regular business in North Carolina, including the location where Plaintiff was employed.

3. This Court has jurisdiction over the subject matter of this action under the commons law of North Carolina and pursuant to the judicial power vested in the General Court Justice by N.C.G.S. §§ 7A-3, 7A-240, and 7A-243.

4. Venue is proper pursuant to N.C.G.S. § 182, as Nash County is the county in which the action arose.

## FACTUAL ALLEGATIONS

5. The allegations of Paragraphs 1-4 of this Complaint are re-alleged and incorporated herein by reference.

6. Plaintiff, Ricky, was employed by Defendant Cummins, Inc. at its facility in Rocky Mount, North Carolina, for approximately thirty-seven (37) years. He began working for the company in 1988 as a line stocker in the Receiving Department.

7. Due to his exemplary work performance, Ricky was promoted to the position of Supervisor in the Receiving Department.

8. Throughout his long tenure with Cummins, Ricky was subjected to ongoing workplace harassment and hostility. He was repeatedly forced to contact corporate leadership and

human resources to report unfair treatment and to contest unjustified demotions or suspensions initiated by certain supervisors.

9. On or about October 1, 2018, Defendant hosted an annual "United Way Jail-A-Thon" fundraising event at the plant, where employees could pay to have coworkers "arrested" for humorous reasons. The chosen employee would then wear a jail uniform and pose for a mugshot until they raised double the amount to "post bail."

10. Ricky's team raised $40 to have him "arrested" for "being crazy." Ricky was required to stand at the front of the facility, pose for a mugshot, and hold a sign labeled "crazy." Deeply uncomfortable with this, Ricky paid $80 of his own money to avoid wearing the jail suit, which he found demeaning and stigmatizing.

11. Ricky has been diagnosed with major depressive disorder and suffers from a seizure disorder, both of which make references to being "crazy" not only insulting, but also psychologically harmful and stigmatizing.

12. On or about November 29, 2018, Ricky was called into a meeting and informed that an employee had recorded him "nodding off" at his desk on November 21, 2018. Ricky explained that his behavior was related to his seizure disorder, but his supervisor disregarded his explanation and immediately demoted him to a forklift driver position in the Materials Department.

13. Ricky submitted a formal complaint through the company's Corporate Ethics Hotline and provided documentation of his medical condition and medication side effects. Despite this, the demotion was not reversed.

3

14. Shortly after demotion, Human Resources requested two (2) volunteers to transfer from the Materials Department to the North Shipping Department. Ricky volunteered and was accepted for the transfer.

15. However, Ricky was again placed on forklift duty, a position that posed significant safety risks due to his medical condition. Ricky's healthcare providers submitted multiple written requests for accommodations to remove him from forklift duty, but these requests were denied or ignored by Defendant.

16. On or about April 24, 2019, a job posting became available for a North Shipping Office Technician.

17. Ricky made several expressions of interest in the Technician position and was finally offered the role in April 2022.

18. During Ricky's 37 years with Cummins, no male had ever been hired into an office technician position. Ricky was the first male to hold this role.

19. Within two (2) weeks of starting in the office, Ricky was reassigned to forklift duty due to staffing shortages.

20. Human Resources assured Ricky he would return to the office and resume training on September 26, 2022.

21. Ricky was approved for FMLA leave from July 30, 2022 to August 15, 2022 due to his medical condition.

22. Upon release to return to work, Cummins' onsite physician imposed restrictions that Ricky should not operate mobile equipment or work at heights due to medical risks. Cummins extended his leave through September 15, 2022.

4

23. Ricky resumed his office position on September 15, 2022, but soon experienced discriminatory and exclusionary treatment from his female coworkers, who refused to train him as the only male in the office.

24. The office training process involves staged advancement, beginning with checking truck drivers in and out. Training is typically provided for advancement to other tasks, but Ricky was systematically denied that training.

25. Female employees hired the same year as Ricky were trained and promoted beyond the entry-level task, while Ricky remained stuck checking in truck drivers for over two (2) years.

26. Audriette Joyner, the designated team lead trainer, openly stated on multiple occasions that she would not train Ricky, even after the manager specifically assigned her to do so.

27. Ricky documented these incidents of discriminatory treatment and submitted them to his manager. He also had multiple meetings with Human Resources and filed a complaint through the Corporate Ethics Hotline, all without resolution.

28. On or around August 8, 2024, Ricky called a team meeting of approximately 10-15 people to address the ongoing training disparities and express concern about the refusal to provide him with equal training opportunities.

29. During the meeting, Audriette Joyner again declared in front of the entire group, including the manager, that she would not train Ricky, stating explicitly, "It ain't gonna happen." She also commented that Ricky was hired with "no skills or skill set."

30. Ricky's manager responded by stating that Ricky did, in fact, have system knowledge from his prior department.

5

31. Following this meeting, Ricky's mental health deteriorated further, and he was placed on FMLA leave from August 29, 2024 through September 17, 2024.

32. Upon returning to work in September 2024, Ricky continued to face the same discriminatory conditions and still was not provided proper training, while new female employees advanced to higher-level tasks.

33. On or about December 2, 2024, Ricky met with HR Generalist Bolajoko ("Nikky") A Ifemade to report the ongoing issues regarding the office training. Nikky stated she would consult with Ricky's manager.

34. A few days later, Ricky's manager reassigned him to assist employee Amy Clary with planning and creating load assignments.

35. After getting to know Ricky during training, Amy Clary apologized to Ricky for having previously mistreated him based on how others were treating him and acknowledged that Ricky did not deserve such treatment.

36. Since Ricky's complaints about the lack of training and discriminatory treatment, anonymous and false reports were made against him in what appears to be a retaliatory effort to get him disciplined or terminated.

37. As a direct result of the discrimination and hostile work environment described above, Ricky was denied opportunities for advancement within the company, including promotions, access to higher-level responsibilities, and increased compensation.

38. The discriminatory conduct and persistent mistreatment also had a severe and detrimental impact on Ricky's health. The stress and emotional toll of being subjected to hostility, exclusion, and retaliation at work significantly aggravated Ricky's diagnosed Major Depressive Disorder and seizure disorder, both of which were known to Defendant.

6

39. Due to the worsening of his medical conditions caused by the work environment, Ricky was forced to take periods of medical and FMLA leave. These absences, directly linked to the discrimination, resulted in loss of wages and further disrupted his ability to advance within the company.

40. Ricky's emotional and physical well-being, financial stability, and career trajectory were all negatively impacted as a result of Defendant's failure to address or remedy the discriminatory treatment and hostile work environment.

41. On April 30, 2025, Ricky received his Right-to-Sue Notice from the Equal Employment Opportunity Commission regarding his present claims against Defendant. (Exh. A)

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of Title VII of The Civil Rights Act of 1964)

42. The allegations of Paragraphs 1-40 of this Complaint are re-alleged and incorporated herein by reference.

43. Plaintiff is a male who was employed by Defendant for approximately thirty-seven (37) years and had a consistent history of satisfactory performance.

44. In or around April 2022, after three (3) years of applying for and consistently expressing interest in the role, Plaintiff was finally offered an office position – marking the first time a male employee had held such a position in that department, which had previously consisted entirely of female employees.

45. After transitioning to the office position, Plaintiff was subjected to disparate treatment based on his gender.

7

46. While other new hires – all of whom were female – were progressively trained and promoted into advanced roles within the office, Plaintiff was assigned to a basic task for more than two (2) years, without the opportunity to advance.

47. Plaintiff was repeatedly denied trained and mentorship opportunities necessary to progress, including being intentionally excluded by Lead Trainer Audriette Joyner, who refused to train Plaintiff.

48. Audriette Joyner even stated publicly during a team meeting that she would not train Plaintiff.

49. Female cowokrers who started after Plaintiff were trained, mentored, and promoted, while Plaintiff remained in a stagnant role without justification based on performance and experience.

50. One coworker, Amy Clary, later acknowledged to Plaintiff that she apologized for treating him poorly, explaining that she had only done so because of how "everyone else" treated him, confirming a hostile work environment rooted in gender-based bias.

51. Plaintiff had a pre-existing diagnosis of Major Depressive Disorder, which had been managed prior to the events described. However, the ongoing discriminatory treatment, exclusion, and hostile work environment he endured substantially exacerbated his condition, causing a significant decline in his mental health. As a result, Plaintiff was forced to take a leave of absence under the Family and Medical Leave Act (FMLA) to address the worsening of his symptoms.

52. Plaintiff's FMLA leave caused him to lose income, and due to the lack of training and advancement, Plaintiff also missed out on promotional opportunities and potential pay increases he otherwise would have been eligible for.

8

53. As a direct result of the Defendant's violation of Title VII of The Civil Rights Act of 1964, Plaintiff has suffered financial losses in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00).

**COUNT II**
**(Hostile Work Environment)**

54. The allegations of Paragraphs 1-52 of this Complaint are re-alleged and incorporated herein by reference.

55. Following his transition into the office role, Plaintiff was subjected to a hostile work environment based on his gender.

56. Plaintiff was repeatedly and intentionally excluded from training and advancement opportunities provided to all other office staff, all of whom were female.

57. The Lead Trainer Audriette Joyner, openly stated in a team meeting that she would not train Plaintiff, while continuing to train all other female employees. Upon information and belief, this public refusal to perform her role was based solely on Plaintiff's gender and contributed to an atmosphere of ridicule and exclusion.

58. Plaintiff was isolated, marginalized, and ignored by coworkers and management, creating a workplace environment filled with hostility and bias, rather than support and equal treatment.

59. A coworker, Amy Clary, later admitted that she treated Plaintiff poorly because she was influenced by how "everyone else treated him," and she later apologized after realizing he did not deserve such treatment.

60. Plaintiff's treatment was not merely occasional or trivial, but pervasive and severe, lasting for over two (2) years, during which he was not permitted to advance or even train beyond the initial new-hire task, while others moved up the ranks.

61. The conduct described herein was unwelcome, based on Plaintiff's gender, and was severe or pervasive enough to alter the terms and conditions of employment.

62. Defendant had actual knowledge of the conduct directed at Plaintiff, as Plaintiff consistently notified his manager, direct supervisors, and Human Resources about the ongoing mistreatment, exclusion, and refusal to train him. Despite these repeated complaints, Defendant failed to take prompt or effective remedial action, allowing the hostile work environment to persist for over two years.

63. As a direct result of the Defendant's violation under Title VII of The Civil Rights Act of 1964, Plaintiff has suffered financial losses in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00).

## COUNT III
### (Negligent Supervision and Retention)

64. The allegations of Paragraphs 1-62 of this Complaint are re-alleged and incorporated herein by reference.

65. At all relevant times, Defendant employed individuals who had supervisory and/or training responsibilities, including but not limited to Audriette Joyner (Lead Trainer).

66. Defendant had a duty to exercise reasonable care in the supervision, training, monitoring, and retention of its employees to prevent foreseeable harm to other employees, including Plaintiff.

67. Defendant knew or, in the exercise of reasonable care, should have known that certain employees – specifically Audriette Joyner and others involved in the ongoing discriminatory and hostile conduct – were unfit, unqualified, or prone to discriminatory and harassing behavior in the workplace.

68. Plaintiff repeatedly reported discriminatory treatment, including Audriette Joyner's refusal to train him, her public statement of bias, and ongoing disparate treatment compared to female coworkers, to his manager, supervisors, and Human Resources.

69. Despite these complaints, Defendant took no meaningful action to investigate, discipline, retrain, or remove the employees responsible for creating and perpetuating a hostile and discriminatory work environment for two (2) years.

70. Defendant failed to act and continued to retain and permit these employees to exercise control over Plaintiff's work environment, despite clear evidence of misconduct.

71. As a direct result of the Defendant's violation of North Carolina common law, Plaintiff has suffered financial losses in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00).

**COUNT IV**
**(Intentional Infliction of Emotional Distress)**

72. The allegations of Paragraphs 1-70 of this Complaint are re-alleged and incorporated herein by reference.

73. At all relevant times, Defendant, through its employees, agents, and supervisors – including but not limited to Lead Trainer Audriette Joyner, other coworkers, management, and Human Resources personnel – engaged in a course of conduct that was extreme, outrageous, and intolerable in a civilized society.

74. After his transition to his office role, Plaintiff was intentionally excluded, publicly humiliated, isolated, ignored, and subjected to systemic and prolonged differential treatment.

11

75. Defendant's employees and agents engaged in this conduct knowingly, or at a minimum, with reckless indifference to the predictable and devastating emotional consequences for Plaintiff.

76. Plaintiff made repeated complaints to management, supervisors, and Human Resources about the conduct, yet Defendant failed to take any action, allowing the conduct to continue unchecked for over two (2) years.

77. As a direct result of the Defendant's violation of North Carolina common law, Plaintiff has suffered financial losses in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that:

1. As to Count I of this Complaint, Plaintiff have and recover of the Defendants compensatory damages in an amount to be determined by a trier of fact.

2. As to Count II of this Complaint, Plaintiff have and recover of the Defendants compensatory and punitive damages in an amount to be determined by a trier of fact.

3. As to Count III of this Complaint, Plaintiff have and recover of the Defendants compensatory and punitive damages in an amount to be determined by a trier of fact.

4. As to Count IV of this Complaint, Plaintiff have and recover of the Defendants compensatory and punitive damages in an amount to be determined by a trier of fact.

5. As to all appropriate Counts of this Complaint, Plaintiff have and recover reasonable attorneys' fees from the Defendant.

6. As to all appropriate Counts of this Complaint, Plaintiff be awarded pre-judgment and post-judgment interest.

7. That the costs of this action be taxed against the Defendant.

8. That this case have a **Trial By Jury** on all issues so triable.

9. For such other and further relief as to the Court may seem just and proper.

This the 20th day of November, 2025.

**HAIRSTON LANE, PA**

**_/s/ Taylor C. Rosbrook_**
Taylor C. Rosbrook
N.C. State Bar No. 62631
James E. Hairston, Jr.
N.C. State Bar No. 19687
434 Fayetteville St., Ste. 2350
Raleigh, NC 27601
(919) 838-5295 Telephone
(888) 510-1160 Facsimile
trosbrook@hairstonlane.com
jhairston@hairstonlane.com
*Attorneys for Plaintiff*

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a electronically filed the foregoing **AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Stephen D. Dellinger
Jennifer Staples
Littler Mendelson, P.C.
620 South Tryon Street
Suite 950
Charlotte, North Carolina 28202
sdellinger@littler.com
jstaples@littler.com

This the 20th day of November, 2025.

**HAIRSTON LANE, PA**

***/s/ Taylor C. Rosbrook***
Taylor C. Rosbrook
N.C. State Bar No. 62631
434 Fayetteville St., Ste. 2350
Raleigh, NC 27601
(919) 838-5295 Telephone
(888) 510-1160 Facsimile
trosbrook@hairstonlane.com
*Attorney for Plaintiff*